THE LANGFOND and THE WILLIAM E. FERGUSON.

THE WILLIAM E. FERGUSON.

(District Court, E. D. New York. June 2, 1900.)

COLLISION—TOW AND ANCHORED STEAMER.
    Evidence considered, and *held* to show that a collision between a tow and a steamer at anchor was due to the fault of the tug in failing to allow for the length of her tow and the effect of the tide in changing her course after passing the steamer.

In Admiralty. Libels for collision.

Charles Thaddeus Terry, for the Dredging Co.
Butler, Notman, Joline & Mynderse, for the steamship Langfond.
James J. Macklin, for the tug Ferguson.

THOMAS, District Judge. On February 9, 1899, at about 9 a. m., the Langfond, a foreign, iron, unladen steamship, of about 2,500 gross tons and 1,634 net tons, and whose length was about 300 feet, and whose width and draft were, respectively, 40 and 22 feet, dropped her starboard and largest anchor upon the western anchorage grounds in the harbor of New York. Within an hour thereafter it was discovered that the steamer had drifted from the anchorage grounds to the eastward, under the influence of a severe westerly wind of from 40 to 50 miles per hour. The anchor continued to drag until the vessel had crossed the main channel, which was about 1 mile wide, to a point approximately 1,000 feet from the western limit of the eastern anchorage grounds, when the anchor held. Thereupon the vessel swung a little to the north from her westerly heading, so that the starboard anchor chain passed around the stem to the port side, which added to the difficulty of raising the anchor, as did the low temperature. For the purpose of relieving the strain on the anchor chain, which was 60 fathoms in length, and to enable the winches to hoist the anchor, so that the vessel might return to the anchorage grounds, the steamer was moved slowly forward under her own steam. But she ran past her anchor, whereupon she was stopped and allowed to drop back for a distance to facilitate operations. While in this situation the tug Ferguson, towing four loaded mud scows, the first on a bridle hawser some 250 feet in length, and the others singled out on hawsers some 6 feet in length, passed under the stem of the Langfond; but the starboard side of the third scow in the line was carried against the propeller of the steamer, and the front and starboard side of the fourth scow were brought in collision with the propeller, whereby the propeller and scows were injured. The Ferguson has been libeled in behalf of the steamer, and the Ferguson and steamer have been libeled by the owner of the scows. The scows were not in fault, and the cause of the collision must be traced to the tug or steamer, or both. The steamer is not at fault, so far as the present issues are concerned, unless at a time immediately preceding the collision, and after her anchor had begun to hold and she had gone forward as above stated, she was negligently permitted to drop back on the tow by force

of the westerly wind and the slack in her anchor chain, of which she is accused. If her failure to put out two anchors on the anchorage grounds, whereby she drifted to the place of accident, could be regarded as negligent, as it is not, such alleged negligence was not the proximate cause of the collision, since at that time the anchor was holding the vessel, and the tug and tow were not embarrassed by the former mischance, nor by her presence in the wide main channel, of which they had timely notice. Before considering whether the Langfond did, at the commencement of the passage of the tug and tow, drop back upon the tow, and thereby contribute to the injury, the maneuver of the tow for the purpose of passing under the Langfond's stern should be considered. It is urged against the tug that she went to the eastward, under the Langfond's stern, rather than to the westward, across her bow. The channel is a mile wide. The ebb tides set strongly and naturally to the southwest at the place of collision, but the wind was strong from the west, which to some extent neutralized the usual set of the tide; and two or three coal barges had (one or all) dragged from the western anchorage grounds, so as to occupy some part of the main channel, but they were near the limit of the anchorage grounds. There was a broad mile for passage, and if, as claimed by the tug, the steamer was near the center of the channel, and the coal barges trespassed upon the main way, still there was undoubtedly room for the tug to go to westward; and yet she may not be criticised for passing under the steamer's stern, as she had for the purpose something like a thousand feet of clear water, and other similar tows had just passed in safety. But, if it be concluded that there was sufficient room to the eastward, why did the collision arise? From the evidence of the master of the tug, it is clear that he knew the precise situation of the Langfond at an early time. The evidence of the pilot of the tug shows that, even while he was far away, he had an opportunity to see, and in fact did see, the Langfond; that he saw her drifting at anchor, saw her anchor chain, saw her go forward of her anchor, drop back again on that account, go forward again,—in short, that whatever was done he saw done. He testified that he knew he had before him a vessel at anchor, and that he was to pass her as such. Such testimony is as follows:

"Q. The first time you saw this steamer, Langfond, did you think she was a ship at anchor? A. Yes, sir. Q. What made you think so? A. Because laying there; and, if I remember right, I think I see her anchor chain. Q. You saw her anchor chain out? A. Yes, sir. Q. You knew, then, that you had to pass a ship at anchor? A. Yes, sir. Q. On one side or the other? A. Yes, sir; and made calculations for that. Q. You meant to do your whole duty with reference to that? A. Yes, sir. Q. When did you cease to see that she had an anchor chain? A. I don't know. Q. Was there any time before you passed her that you saw she hadn't taken up her anchor chain? A. That she hadn't taken them up? No, sir. Q. You knew all the while she had an anchor chain out? A. Yes, sir. Q. What made you think she was going to sea? A. By her working ahead. I thought they were heaving an anchor when they worked ahead. Q. They were heaving the anchor, and that is your reason for thinking that? A. Yes. Q. But she was still during all that time, —an anchored ship, so far as you are concerned? A. Yes, sir. Q. And your duty was to pass her as an anchored ship? A. And, if she hadn't drug that anchor, we would have passed her in safety. There was plenty of room. Q. When you saw her back before she moved forward, you thought she was then

heaving her anchor? A. Getting her anchor; yes, sir. Q. She went forward 500 or 600 feet, and backed up 500 or 600 feet. What did you think she was doing that for? A. I thought maybe she stopped her engine, as they do sometimes when they run over an anchor, like that, and come back again. I thought she had gone over the anchor."

In view of this evidence, it is easily concluded that it was the duty of the master of the tug to use care to adjust his course so as to take the tug and her tow past the Langfond, regarded as an anchored ship. He made proper calculations for the tug, but not for the tow, which left the barge helpless, as they were without steering apparatus. It will be observed that he and other witnesses for the tug place the distance at which the tug passed the stern of the steamer at 250 feet. But the master of the tug states that when the first scow arrived opposite the stern of the steamer the distance was reduced to 100 feet. Further questioning enlarged the space possibly to 125 or 150 feet. The mate of the tug fixes the distance between the tug and the steamer at 250 feet, and the distance between the first scow and the steamer at 100 feet. Now, it appears that it was not until the first scow reached a position astern the steamer that the ship's propeller stopped its motion, and that thereafter she took on the motion astern of which the Ferguson complains. Hence, in going 250 feet, the length of the leading hawser, the tow was brought 100 to 150 feet nearer to the steamer than was the tug when she passed the steamer; that is, by some force not attributable to the steamer, the tow approached the steamer about 1 foot for every 2 feet it went forward. The scows would probably average 100 feet in length, so that by the time the third scow was reached the tow would have advanced some 200 feet more, and the forward part of the third scow would, by the same ratio, have been near to or in contact with the propeller; and the evidence is that the collision was with the forward part of the third scow. This mathematical demonstration, based on the evidence of the master and mate of the tug, cannot be escaped, and shows that before the propeller stopped, or the steamer began to drop astern on the tow as claimed, the tow was directed towards the propeller, and that the traction, continued at the same rate, must have produced the collision between the third scow and the propeller, just as in fact it did occur. Now, the evidence is undisputed that the tug, after passing the steamer, pulled several points to the westward; and this undoubtedly drew his tow, aided by the southwesterly set of the tide, directly upon the steamer. There is much evidence in behalf of the tug that the turning of the tug several points to starboard would tend to throw the tow to the eastward; but the fact is glaring, and overcomes theory: The tail of the tow approached, and did not recede from, the steamer. There is very much evidence that the tug passed nearer the steamer than stated by the master and mate of the tug, but it is sufficient to accept the narration of such persons. That explains the collision, and disposes of the claim that the collision was caused by the steamer going astern upon the tow. The evidence of those on board the steamer is that she did not go astern, and that she was stopped because it was seen that a collision was imminent. It is useless to pursue the question. It is evident that the tug drew her tow into a ship obviously at anchor,

and that she did not make sufficient allowance for the tow in rounding the stern of the steamer. The libelant Helliesen should have a decree for damages against the Ferguson, with costs, and the libelant the Interstate Dredging Company should have a decree against the Ferguson, with costs; but the libel as to the Langfond is dismissed.